## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW M MEXICO

**THOMAS WARD, JR.,**

       **Plaintiff,**

    **vs.**                                                            **Civ. No. 11-1039  ACT**

**MICHAEL J. ASTRUE, Commissioner,**
**Social Security Administration,**

      **Defendant.**


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Remand or Reverse Administrative Agency Decision and Memorandum in Support ("Motion") of the Plaintiff Thomas Ward, Jr. ("Plaintiff"), filed August 24, 2012 [Docs. 20 and 22].  The Commissioner of Social Security ("Defendant") filed a Response on October 24, 2012 [Doc. No. 24], and Plaintiff filed a Reply on November 2, 2012 [Doc. No. 25].  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court recommends that the motion to remand be GRANTED.

## I.  PROCEDURAL RECORD

On July 10, 2007, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title  XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3) and an application for Social Security Disability Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42

U.S.C. §§ 401.[1] [Tr. 121, 125.]  Plaintiff alleges a disability beginning November 15, 2006, due to Tourette's syndrome and being legally blind in his left eye from being injured in June 2008. [Tr. 158.] Plaintiff's application was initially denied on October 30, 2007, and denied again at the reconsideration level on March 31, 2008.  [Tr. 71, 75, 79.]

The ALJ conducted a hearing on July 8, 2009. [Tr. 27-70.]  At the hearing, Plaintiff was represented by Attorney Michael Armstrong.  On January 25, 2010, the ALJ issued an unfavorable decision.  In his report, the ALJ found that the Plaintiff has the following severe impairments: Tourette's Syndrome, vision problems in the left eye, back pain, anxiety, and depression.  [Tr. 16.]  However, the ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Id.]  The ALJ also found that Plaintiff has the residual functional capacity to perform either medium or light work as defined in CFR 404.1567(a), but limited as follows:

> [T]he claimant is blind in his left eye and he has lost a corresponding loss of depth perception; the claimant must avoid hazards such as unprotected heights, and dangerous machinery.  He can attend and concentrate for two hours  at a time, and then he needs to take a break, he can then attend and concentrate for two more hours, etc., until the claimant completes an eight hour work day.  Furthermore, the claimant is limited to jobs that are essentially isolated with only occasional supervision by a supervisor, and only occasional interaction with his co-workers, and only incidental public contact.  The claimant would work with things rather than people, and finally he is limited to occupations that allow a person the use of public transportation.

[Tr. 17-18.]  In considering the claimant's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform. [Tr. 25.]

---

[1]  Mr. Ward filed a subsequent application for disability following the ALJ's decision of January 25, 2010. Mr. Ward was found to be disabled starting on January 26, 2010. [Doc. 22 at 2, n. 2.]

On October 4, 2011, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On November 22, 2011, the Plaintiff filed his Complaint for judicial review of the ALJ's decision. [Doc. 1.]

Plaintiff was born on March 5, 1976. [Tr. 152.]  The Plaintiff completed the twelfth grade[2] and has past work experience as a automotive and diesel mechanic.  [Tr. 163.]  The claimant engaged in substantial gainful activity since his alleged onset date of November 15, 2006. [Tr. 15.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security

---

[2]  Plaintiff testified that he dropped out of high school his senior year and obtained his GED while in the Navy. [Tr. 61.]

regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[3]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).  Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its opinion for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214 (quotation omitted).

### III.  MEDICAL HISTORY

Plaintiff was 31 years old at the time he applied for SSI and DIB.  Plaintiff identified his illness and physical injury as "Tourette's Syndrome and legally blind in left eye."  [Tr. 158.] Plaintiff explained that his physical injury limits his ability work because he "cannot legally

---

[3]  Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

drive.  I must be able to drive in the jobs I did in the past.  I can no longer drive as I cannot obtain a DL.  I cannot see out of my left eye."  [Tr. 117.]  Plaintiff indicated that he stopped working on July 3, 2007, because "they found out that my health card for drivers was expired.  I cannot get it renewed due to the blindness in my left eye."  [Id.]

A.    **Presbyterian Hospital**

On November 23, 2006, Plaintiff presented to Presbyterian Acute Care Emergency Room complaining of a gunshot wound to his left hand and left eye pain. [Tr. 286.] Plaintiff reported that his gun accidentally went off while he was cleaning it.[4] [Id.] Plaintiff's wound was scrubbed, irrigated and left open. [Tr. 287/] Plaintiff was referred to Dr. Robert Melendez of Eye Associates for the injury to his left eye. [Tr. 294.]

B.    **Eye Associates**

On November 25, 2006, Plaintiff was seen at Eye Associates by Dr. Robert Melendez. Plaintiff informed Dr. Melendez that he was cleaning his hand gun when it went off in his hand. [Tr. 309.] Plaintiff described dropping the gun and then feeling something hit his left eye. [Id.] Dr. Melendez diagnosed Plaintiff with hyphema,[5] abrasion to cornea, and traumatic iridoplegia.[6]

---

[4]  Plaintiff later admitted to Dr. Paula Hughson that he lied at the emergency room about the actual details of how the gun discharged.  He told Dr. Hughson that the gun discharged when he tried to pry it from his girlfriend's hand to avoid an apparent suicide attempt. [Tr. 313.]

[5]  A hyphema is the medical term for bleeding in the front part of the eye.  This is caused when there is a direct blow to the eye (the lid may be open or closed).  Since the blood is blocking the passage of light into the eye, it causes blurred or dim vision.  There may also be some pain. [Tr. 294.]

[6]  Paralysis of the sphincter muscle of the iris resulting in a dilated pupil.  http://medical-dictionary. thefreedictionary.com/iridoplegia.

Dr. Melendez prescribed Zymar,[7] Econopred Plus,[8] and a Fox Shield. [Id.] Plaintiff was advised

to rest in bed, elevate his head, and refrain from activity. [Id.]

On September 20, 2007, Plaintiff returned to Eye Associates and saw Dr. Mi-Kyoung

Song. [Tr. 302.] Plaintiff complained of decreased visual acuity and reported that his left eye

vision "is like looking through a black hole and seems to be getting worse over time." [Tr. 306.]

Plaintiff stated he stopped treatment from trauma due to financial concerns. [Tr. 302.]  Dr. Song

ordered optical coherence tomography and fluorescent angiography of both eyes. [Id.] The left

eye revealed normal macula and vessels, but "retinal pigment epithelium disturbance in the left

eye to account for the loss of central vision." [Id.] Dr. Song recommended Plaintiff return in six

months. [Id.]

C.     **Paula Hughson, M.D.**

On October 15, 2007, Plaintiff had a psychiatric evaluation by Paula Hughson, M.D.

[Tr. 312.]  Dr. Hughson is employed by New Mexico Disability Determination Services. [Id.] In

addition to reviewing Plaintiff's Adult Function Report, Dr. Hughson reviewed several medical

records provided by the Plaintiff documenting his history of Tourette's Syndrome and the blunt

trauma to his left eye. [Id.] Dr. Hughson's notes include a thorough discussion of Plaintiff's

present illness, substance abuse history, past psychiatric history, psychosocial history, and past

medical history. [Tr. 313-315.] Dr. Hughson also performed a mental statue examination.

[Tr. 315.] Dr. Hughson assessed Plaintiff as follows:

---

[7]  Zymar drops is a fluoroquinolone antibiotic.  http://www.drugs.com/cdi/zymar-drops.html.

[8]  Prednisolone ophthalmic (for the eyes) is used to treat eye swelling caused by allergy, infection, injury, surgery, or other conditions.  http://www.drugs.com/mtm/econopred-plus.html.

Mr. Ward has a well documented history of Tourette's Syndrome, and he suffered from many associated problems, particularly in childhood and early adolescence. Conduct, learning, and socialization were affected by his impulsivity and seeming inability to control himself.  As an adult he has continued to suffer from poor self image and excessive social sensitivity, leading to frequent arguments at the workplace, and often resulting in his being fired.  Chronic sleep deprivation secondary to untreated sleep apnea may also contribute to his irritability.  At present he is also moderately depressed as a result of developments over the past year: his fiancee's suicide attempt involving a firearm, his injury, and the loss of his job.  He has responded well to Prozac in the past and that would seem a good first choice medication wise.  He would also be a good candidate for psychotherapy aimed at improving self esteem and developing better coping skills, especially in social and job situations.  He is capable of managing any funds.  He should not experience more than mild difficulties in understanding and remembering basic instructions or mild to moderate difficulty concentrating and persisting at tasks of basic work.  From the history it would seem that the main and significant limitation in a work setting is getting along with others.  Assessment of any visual limitations secondary to his injury is outside my area of expertise.

[Tr. 315.]  Dr. Hughson diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Tourette's Syndrome |
| | Adjustment Disorder with Mixed Emotional Features |
| | Breathing Related Sleep Disorder |
| Axis II: | Diagnosis Deferred |
| Axis III: | Please refer to Medical History |
| Axis IV: | Coping with neurological and behavior disorder; multiple job losses; marital strain; s/p gunshot related injury to the eye and decreased vision. |
| Axis V: | Global Assessment of Functioning (GAF): 50[9] - Serious Symptoms and Serious Impairment |

[Tr. 316.]

---

[9]  The GAF is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning."  Diagnostic & Statistical Manual of Mental Disorders, 5th ed. (1994) ("DSM-IV"), p. 32.  Individuals with a GAF between 50 and 55 experience moderate to serious symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks; suicidal ideation, severe obsessional rituals, frequent shoplifting), or any moderate to serious difficulties in social, occupational, or school functioning.  *Id*.

**D.** __Psychiatric Review Technique - J. LeRoy Gabaldon, Ph.D.__

On October 22, 2007, Dr. LeRoy Gabaldon prepared a Psychiatric Review Technique based on his review of Plaintiff's medical records.  He assessed Plaintiff's medical disposition based on Listing 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. [Tr. 318.] He indicates that Plaintiff's mental impairments are not severe and that Plaintiff's functional imitations are mild. [Tr. 328.] Dr. Gabaldon noted:

> Mr. Ward has a limited education, not completing high school but able to secure his GED while in the service.  He has a history of acting-out.  Poor social ability and psychiatric hospitalization in childhood.  There is no indication of thought disorder or of ongoing substance use.  He is able to care for his own personal needs, engage in household tasks and relate with those he so elects.  Dr. P. Hughson evaluated him on 15 October 2007.  Mr. Ward is cognitively intact and was able to effectively relate during the evaluation.

[Tr. 330.]

**E.** __Physical Residual Functional Capacity Assessment - Dr. David P. Green__

On October 30, 2007, Dr. David Green prepared a Physical Residual Functional Capacity Assessment based on his review of Plaintiff's medical records.  Dr. Green determined that Plaintiff had no exertional limitations, no postural limitations, no manipulative limitations, visual limitations only with respect to depth perception and field of vision, no communicative limitations, and environmental limitations related to concentrated exposure to workplace hazards. [Tr. 337-344.]

**F.** __Los Lunas Family Practice - Joseph Aragon, M.D.__

Plaintiff was an established patient with Dr. Aragon with records dating back to 2004. On January 3, 2008, Plaintiff presented to Dr. Aragon asking for a referral for his eyes and his Tourette's Syndrome. [351.] Dr. Aragon referred Plaintiff to UNM Neurology for his Tourette's Syndrome and to Southwest Opthalmology for his eyes. [Id.]

8

On July 21, 2009, Dr. Aragon completed a Medical Assessment and Ability to Do Work-Related Activities. [Tr. 416-17.] Dr. Aragon assessed Plaintiff's physical activities as follows:

1.     Plaintiff cannot maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently because of pain and fatigue.

2.     Plaintiff can lift and/or carry less than five pounds due to his lumbar disk displacement and lumbar degenerative disk disease.

3.     Plaintiff can stand and/or walk for a total of less than 2 hours in an 8-hour workday due to his lumbar disk displacement and lumbar degenerative disk disease.

4.     Plaintiff can sit for less than 4 hours in an 8-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort due to his lumbar disk displacement and lumbar degenerative disk disease.

5.     Plaintiff's ability to push and pull are limited in his upper extremities due to his lumbar disk displacement and lumbar degenerative disk disease.

6.     Plaintiff is limited in reaching all directions.

7.     Plaintiff can occasionally kneel, but must never stoop, crouch or crawl.

Dr. Aragon assessed Plaintiff's non-physical activities as follows:

1.     Plaintiff suffers with severe pain that causes sleep disturbances, fatigue, and requires Plaintiff to rest or lie down at regular intervals.

2.     Plaintiff has marked limitations in each of the following non-physical work activities:

        Maintain attention and concentration for extended periods

        Perform activities within a schedule

        Maintain regular attendance and be punctual within customary tolerance

        Maintain physical effort for long periods without a need to decrease activity or pace, or rest intermittently

        Sustain an ordinary routine without special supervision

9

> Work in coordination with/or proximity to others without being distracted by them
>
> Make simple work-related decisions
>
> Complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.

[Tr. 417.]

### G.      Mental Residual Functional Capacity Assessment - Elizabeth Chiang, M.D.

On March 19, 2008, State agency medical consultant Dr. Elizabeth Chiang prepared a Mental Residual Functional Capacity Assessment based on her review of Plaintiff's medical records. [Tr. 360-362.] Dr. Chiang determined that Plaintiff had moderate limitations in (1) his ability to interact appropriately with the general public, (2) his ability to accept instructions and respond appropriately to criticism from supervisors; and (3) his ability to get along with coworkers or peers without distracting them or exhibit in behavioral extremes. [Tr. 361.] Otherwise, Dr. Chiang found Plaintiff was not limited in his understanding and memory, his sustained concentration and persistence, his social interaction, and his adaptation. [Tr. 360-61.] Dr. Chiang summarized:

> This 31 year old claimant alleges Tourette's.  At reconsideration, he reports depression and anxiety.
>
> 10/08 CE found claimant has worked as a mechanic.  He reports tics, blowing up at others and some panic attacks.  He has depressive symptoms.
>
> Mental Status Exam is notable for a very talkative man who is prone to strong opinions.  Attention and concentration are intact.  Memory is intact.  Cognition is intact.  Examiner finds mild and moderate functional limitations.
>
> PCP notes do find Tourette's Syndrome.
>
> Activities of Daily Living are not impaired by psychiatric disorder.  He is social.  He can follow instructions from a psych perspective.

Claimant can understand, remember, and carry out complex instructions, use judgment to make decisions, attend and concentrate for two hours at a time, interact appropriately with co-workers and supervisors, and respond appropriately to changes in a work setting.

[Tr. 362.]

### H.    Psychiatric Review Technique - Dr. Elizabeth Chiang

On March 19, 2008, State agency medical consultant Dr. Elizabeth Chiang prepared a

Psychiatric Review Technique based on her review of Plaintiff's medical records. [Tr. 364-376.]

She assessed Plaintiff's medical disposition based on Listing 12.02 - Organic Mental Disorders

and Listing 12.04 Affective Disorders.  [Tr. 364.] She indicates that Plaintiff's functional

limitation is mild with respect to his activities of daily living and maintaining concentration,

persistence, or pace. [Tr. 374.]  She further indicates that Plaintiff's functional limitations are

moderate with respect to maintaining social functioning. [Id.]

### I.    UNM - Neurosurgery - Jeremy T. Phelps, MD

On April 10, 2008, Plaintiff was evaluated by Dr. Jeremy Phelps for worsening pain in

his left hand following his gunshot wound. [Tr. 381] Nerve conduction studies provided by the

Plaintiff suggested left median nerve neuropathy. [Tr. 382.] Dr. Phelps wanted to "repeat his

nerve conduction studies and perform electromyographic studies at the University Hospital."

[Id.] Dr. Phelps recommended splinting Plaintiff's wrist until further studies were completed.

[Id.]

### J.    UNM - Eye Outpatient

On January 28, 2008, and February 4, 2008, Plaintiff was seen at UNM Hospital for

follow up with his central vision loss. [Tr. 384-387.]  [Records are illegible as to assessment or

follow up care.]

### K.    UNM  - Neurology - Sarah Elizabeth Pirio Richardson, M.D.

11

On January 31, 2008, Plaintiff was evaluated by Dr. Pirio Richardson at University Hospital. [Tr. 390-392.] Plaintiff was referred by Dr. Aragon for evaluation of his Tourette's Syndrome. [Id.]  Dr. Pirio Richardson's notes include a discussion of Plaintiff's present illness, past medical history, past surgical history, social history, and family history.  [ Tr. 390-91.] Dr. Pirio Richardson also performed a neurologic exam.  [Tr. 391.] Dr. Pirio Richardson assessed Plaintiff as follows:

> The patient is a 31 year old male with a history of  Tourette's syndrome and behavioral problems since an early age, who is here for evaluation and treatment. I concur with the diagnosis of Tourette's syndrome.  He had onset of both motor and vocal tics before the age of 21 with concurrent attention deficit hyperactivity disorder and some obsessive compulsive traits.  There does not seem to be any other evidence on his examination for another neurodegenerative disorder ongoing.  We discussed at length the possible treatment options.  The first is that there are several treatment options for just addressing the motor tics, all of which have side effects. His primary concern today is his behavioral problems.

Dr. Pirio Richardson recommended the following:

1.  Refer the patient for psychiatry evaluation.  He was given the number to call to make an appointment.

2.  We will retry the Prozac at 20 milligrams daily, as that gave him his best results in high school and may help with some of his depression and anger management symptoms, and then we can address the motor tics as time goes on.  I will have the patient return to clinic in two months.  He is to call if he is having difficulty on the medications.  He was given a patient education handout on the side effects of the Prozac and answered his questions.

[Tr. 391.]

On April 30, 2008, Plaintiff was seen for follow up with Dr. Pirio Richardson. [Tr. 405.] Plaintiff reported that he was continuing to have problems with aggression and irritability. [Tr. 406.] Dr. Pirio Richardson increased Plaintiff's Prozac to 40 mg. Daily and prescribed clomidine to address Plaintiff's tics. [Id.]

**L.     UNM Behavioral Health Adult Outpatient - Department of Psychiatry - Frederick Stephen Lewis, M.D.**

On July 30, 2008, Plaintiff was evaluated by Dr. Stephen Lewis for his Tourette's disorder and mood disorder. [Tr. 400.]  Dr. Lewis's notes include a discussion of Plaintiff's present illness, past psychiatric history, social history, substance abuse history, past medical history, and past surgical history.  [ Tr. 400-402.] Dr. Lewis also performed a mental status examination.  [Tr. 402.] Dr. Lewis's impressions are as follows:

> The patient is a 32 year old male, with Tourette's disorder, demonstrating criteria for major depressive disorder, moderate severity, and a CES-D score of 24, who is currently being treated with Prozac 40 milligrams by mouth daily and Clomidine 0.1 milligram by mouth twice daily with moderate effect.

> Dr. Lewis diagnosed Plaintiff as follows:

> Axis I:        Tourette's Syndrome
>                  Major depressive disorder, single episode, moderate severity

> Axis II:       Deferred

> Axis III:      Gastroesophageal reflux disease

> Axis IV:      Social stressors; financial stressors; occupational stressors; family
>                  stressors

> Axis V:       GAF = 50

[Tr. 400.]

Dr. Lewis increased Plaintiff's Prozac to 60 milligrams daily with a target dose of 80 milligrams daily. [Tr. 402.] Plaintiff was advised to continue the Clomidine prescribed by Dr. Pirio Richardson. [Id.]

**M.     Albuquerque Health Partners - Dr. Michael F. Malizzo**

On February 9, 2009, Plaintiff was referred to Dr. Malizzo of Albuquerque Health Partners for complaints of pain across the lumbosacral part of his back. [Tr. 396.] Plaintiff stated

the pain started in June of 2008 after he was doing heavy lifting. [Id.] An MRI of the lumbar

spine from January 5, 2009, revealed a small disk bulge with mild degenerative change and

dehydration at L5-S1, same changes were seen at L4-L5, but there is also a moderately large left

paracentral disk herniation causing moderate central canal stenosis and mild left proximal

foraminal stenosis. [Tr. 397.]   Dr. Malizzo's impressions were (1) lumber disk displacement

without myelopathy and (2) lumbar degenerative disk disease. [Id.] Dr. Malizzo referred Plaintiff

for physical therapy and offer him a trial of lumbar epidural steroid injection, which Plaintiff

declined. [Tr. 397.]

     **N.**      **<u>Doctor on Call - John Vigil, M.D.</u>**

On July 28, 2009, Plaintiff was seen by Dr. John Vigil for a consultative evaluation and

impairment evaluation with respect to his back pain, vision loss of the left eye, carpal tunnel

syndrome and traumatic nerve damage to the left hand. [Tr. 420.]  Dr. Vigil's notes include a

review of Plaintiff's medical records and clinical studies, and a discussion of Plaintiff's present

illness, past medical history, past surgical history, family medical history, and social/occupation

history. [Tr. 420-422.]  Dr. Vigil did a review of systems and a physical examination. [Tr. 423-

424.]  Dr. Vigil assessed Plaintiff as follows:

       1.      Chronic low back pain with HNP and radiculopathy
       2.      Blind, left eye
       3.      Carpal tunnel syndrome, left hand
       4.      Traumatic neuropathy, ulnar nerve, left hand
       5.      Tourette's Syndrome
       6.      Depression/Anxiety
       7.      GERD
       8.      Sleep Apnea

[Tr. 424.]  Dr. Vigil found Plaintiff to have a whole body impairment of 26% and to be

significantly disabled. [Tr. 425.]

On August 4, 2009, Dr. Vigil completed a Medical Assessment and Ability to Do Work-Related Activities. [Tr. 416-17.] Dr. Vigil assessed Plaintiff's physical activities as follows:

1.      Plaintiff cannot maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently because of pain and orthostatic intolerance.

2.      Plaintiff can lift and/or carry less than five pounds due to his herniated lumbar disc with radiculopathy.

3.      Plaintiff can stand and/or walk for a total of less than 2 hours in an 8-hour workday due to his herniated lumbar disc with radiculopathy.

4.      Plaintiff can sit for less than 4 hours in an 8-hour workday due to his herniated lumbar disc with radiculopathy.

5.      Plaintiff's ability to push and pull are limited in his upper extremities due to his herniated lumbar disc with radiculopathy.

6.      Plaintiff can only do repetitive actions with his right hand.

7.      Plaintiff can never kneel, stoop, crouch or crawl.

[Tr. 427.]

Dr. Vigil assessed Plaintiff's non-physical activities as follows:

1.      Plaintiff suffers with severe pain from herniated disc and radiculopathy that causes sleep disturbances, fatigue, and requires Plaintiff to rest or lie down at regular intervals.

2.      Plaintiff has marked limitations in each of the following non-physical work activities:

        Maintain attention and concentration for extended periods

        Perform activities within a schedule

        Maintain regular attendance and be punctual within customary tolerance

        Maintain physical effort for long periods without a need to decrease activity or pace, or rest intermittently

Sustain an ordinary routine without special supervision

Work in coordination with/or proximity to others without being distracted by them

Make simple work-related decisions

Complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.

[Tr. 428.]

O.    **Steven K. Baum, Ph.D.**

On July 28, 2009, Plaintiff was evaluated by Psychologist Steven K. Baum. [Tr. 426.]

Dr. Baum's notes include a discussion of Plaintiff's medical and job histories.  Following a

clinical examination, Dr. Baum diagnosed Plaintiff as follows:

Axis I:        Tourette's Syndrome

Axis II:       Chronic Depression

Axis V:       GAF = 50

[Tr. 426.]   Dr. Baum determined that "[t]he patient has psychological impairment that precludes

him from functioning at work and in a relationship." [Id.]

P.    **Valencia Counseling Service, Inc. - Patricia Horton, LPCC, MA and Glenna Giles, MSN, RN, CNS**

On July 9, 2009, Plaintiff began seeing Patricia Horton, LPCC, MA, at Valencia

Counseling Service, Inc., to address his major depression, problems related to his Tourette's

Syndrome, and Bereavement.  [Tr. 430.] On August 14, 2009, Ms. Horton assessed that Plaintiff

evidenced limited control over his anger and ability to adjust or conform to social situations and

stress. [Id.]

On August 14, 2009, Glenna Giles, MSN, RN, CNS, also at Valencia Counseling Service, Inc., completed a Medical Assessment of Ability To Do Work-Related Activities (Mental). [Tr. 431.] Ms. Giles assessed Plaintiff's mental limitations as follows:

1.    Plaintiff has marked limitations in understanding and memory as follows:

> Remember locations and work-like procedures
> Understand and remember detailed instructions

Plaintiff has moderate limitations in understanding and memory as follows:

> Understand and remember short and simple instructions.

Ms. Giles commented that Plaintiff has problems handling stress, and that emotions will probably get in the way of behaviors on the job. [Tr. 431.]

2.    Plaintiff has marked limitations in sustained concentration and persistence as follows:

> Carry out detailed instructions
>
> Maintain attention and concentration for extended periods of time
>
> Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance
>
> Sustain an ordinary routine without special supervision
>
> Work in coordination with/or proximity to others without being distracted by them
>
> Complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.

Plaintiff has moderate limitation in sustained concentration and persistence as follows:

> Make simple work-related decisions

17

Plaintiff has slight limitations in sustained concentration and persistence as follows:

Carry out very short and simple instructions

Ms. Giles commented that Plaintiff has "problems concentrating, much anger - explosive anger." [Tr. 431.]

3.      Plaintiff has marked limitations in social interaction as follows:

Interact appropriately with the general public

Accept instructions and respond appropriately to criticism from supervisors

Get along with coworkers or peers without distracting them or exhibiting behavioral severes

Plaintiff has moderate limitations in social interactions as follows:

Ask simple questions or request assistance

Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

Ms. Giles commented that Plaintiff is very sensitive to criticism and feels victimized by the world. [Tr. 432.]

4.      Plaintiff has marked limitations in adaptation as follows:

Respond appropriately to changes in the work place.
Travel in unfamiliar places or use public transportation
Set realistic goals or make plans independently of others

Plaintiff has moderate limitations in adaptation as follows:

Be aware of normal hazards and take adequate precautions.

Ms. Giles commented that Plaintiff is rigid and has trouble adjusting to change and other's opinions. [r. 432.]

Ms. Giles also assessed Plaintiff as meeting the A and B criteria for Listings 12.04 - Affective Disorders and 12.06 - Anxiety-Related Disorders. [Tr. 433-434.]

On August 17, 2009, Ms. Giles completed a Psychiatric Evaluation and prepared a Treatment Plan. [Tr. 438-448.]  Ms. Giles' notes include a discussion of Plaintiff's present illness, psychiatric history, family medical psychiatric history, medical history, and social history.  Following a mental status exam, Ms. Giles diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Tourette's Syndrome<br>MDD with anxiety |
| Axis II: | Deferred |
| Axis III: | Deferred |
| Axis IV: | Social and Economic Distress |
| Axis V: | GAF = 55 |

[Tr. 447.]

## IV.  ANALYSIS

Plaintiff first argues that the ALJ committed reversible error in failing to properly weigh the opinions of Patricia Horton, LPCC and Glenna Giles, CNS, according to SSR 06-3p. [Doc. 22 at 6.]  SSR 06-3p explains that if a treating source opinion is not given controlling weight, opinions of *other* medical sources, such as licensed professional clinical counselors and clinical nurse specialists, will be evaluated using the same regulatory factors used for evaluating medical opinions.  SSR 06-03 (citing 20 C.F.R. §§ 404.1527, 416.927).  Those factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion;

(5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  20 C.F.R. § 404.1527(d)(1)-(6); *see Siegle v. Barnhart*, 377 F. Supp. 2d 932, 940 (D. Colo. 2005) (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (finding that ALJ is required to consider nontreating physician's opinion with regard to "several factors, and to provide specific, legitimate reasons for rejecting it."  (Citations omitted.)

As to the opinions of LPCC. Horton and CNS Giles, the ALJ only stated that the opinion of Dr. Elizabeth Chiang was entitled to greater weight "than that of a LPCC or a CNS" because Dr. Chiang is a medical doctor. [Tr. 22.]  The Commissioner argues this is sufficient because LPCC Horton and CNS Giles are not acceptable medical sources and are not qualified to diagnose Plaintiff. [Doc. 24 at 4.]  The Commissioner further argues that it is not error for the ALJ to not explicitly consider each of the factors which support or contradict his opinion. [Id. at 5.]

The Court agrees that an ALJ does not violate § 404.1527(d) by failing to explicitly discuss each of the factors which support or contradict his opinions *so long as* the ALJ's decision is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  The problem here is that the ALJ failed to discuss any of the factors.  Here, despite the fact that both Patricia Horton and Glenna Giles have each examined the Plaintiff and have an ongoing therapeutic relationship with him,

the ALJ gave greater weight to Dr. Chiang, a State agency nonexamining source opinion, simply because Dr. Chiang is a medical doctor.[10]

 "[T]he opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Williams v. Bowen*, 844 F.2d 748, 757 (10th Cir. 1988); see also 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(d)(1), (2); see also SSR 96-6p, 1996 WL 374180, at *2.  The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.  *Id.*

 The evaluation of an opinion from a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case.  Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.  SSR 06-03p at *3.  In evaluating the evidence from other medical sources, SSR 06-03p states:

> An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.  For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

SSR 06-03p at *6.

---

[10]   The Court notes that the ALJ appears to have relied almost exclusively on Dr. Chiang, giving little weight to Dr. Aragon, Dr. Vigil, Dr. Malizzo, or Dr. Baum, all of whom determined Plaintiff was markedly limited in his physical and non-physical activities.

Finally, SSR 06-03p states how an ALJ should explain the consideration given to opinions from other medical sources as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what an adjudicator must explain in the disability determination, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.*

SSR 06-03p at *6.  (Emphasis added.)

SSR 06-3p explains that if a treating source opinion is not given controlling weight, opinions of *other* medical sources, such as licensed professional clinical counselors and clinical nurse specialists, will be evaluated using the same regulatory factors used for evaluating medical opinions.  SSR06-03 (citing 20 C.F.R. §§ 404.1527, 416.927).  Thus, the ALJ was required to evaluate the opinions of Ms. Horton and Ms. Giles using the same regulatory factors used for evaluating medical opinions.  The ALJ failed to do so here.  The ALJ also failed to provide specific legitimate reasons for rejecting the opinions of "other sources" or to otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  SSR 06-03p; 20 C.F.R. §§ 404.1527 and 416.927.  This is reversible error.

The Court will not address Plaintiff's remaining claims of error.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

## V.  CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse or Remand

Administrative Decision [Doc. 20] is GRANTED for proceedings consistent with this

memorandum opinion.

**ALAN C. TORGERSON**
**United States Magistrate Judge,**
**Presiding by Consent**